Filed 8/22/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S222620 |
| v. | ) | |
| | ) | Ct.App. 3 C074662 |
| BRANDON LANCE RINEHART, | ) | |
| | ) | Plumas County |
| Defendant and Appellant. | ) | Super. Ct. No. M1200659 |
| _____ | ) | |

California was shaped by the search for gold. In time, the state's other natural treasures—its waters and wildlife, its forests and coastlines—proved similar draws. We consider here a conflict arising from the competing desires to exploit and to preserve these various resources. The People assert the state may, in pursuit of protecting fish habitats and the quality of the state's waterways, temporarily ban a particular method of gold mining pending adoption of suitable regulations. Defendant Brandon Lance Rinehart, convicted of engaging in the banned mining technique, asserts it is the only practicable method and federal law promoting mining on federal land preempts the state's contrary legislation. The Court of Appeal concluded Rinehart potentially was correct and remanded for consideration of additional evidence and argument. We granted the People's petition for review.

We conclude the state's moratorium is not preempted. The federal laws Rinehart relies upon reflect a congressional intent to afford prospectors secure

possession of, and in some instances title to, the places they mine. But while Congress sought to protect miners' real property interests, it did not go further and guarantee to them a right to mine immunized from exercises of the states' police powers. We reverse the Court of Appeal.

FACTUAL AND PROCEDURAL BACKGROUND

Suction dredging is a technique used by miners to remove matter from the bottom of waterways, extract minerals, and return the residue to the water. A high-powered suction hose vacuums loose material from the bottom of a streambed. Heavier matter, including gold, is separated at the surface by passage through a floating sluice box, and the excess water, sand, and gravel is discharged back into the waterway. (See Fish & G. Code, § 5653, subd. (g); Cal. Code Regs., tit. 14, § 228; *People v. Osborn* (2004) 116 Cal.App.4th 764, 768; *Karuk Tribe of California v. U. S. Forest Service* (9th Cir. 2012) 681 F.3d 1006, 1012 (en banc).)

California has regulated suction dredging for the last half-century. As originally enacted, Fish and Game Code section 5653 authorized the Department of Fish and Game, now known as the Department of Fish and Wildlife (Department), to issue permits for suction dredging, so long as it determined the dredging would not harm fish. Operation of a suction dredge without, or in violation of the terms of, a permit was a misdemeanor. (Stats. 1961, ch. 1816, § 1, p. 3864.) Later amendments gave the Department authority to designate particular waterways off-limits to suction dredging (Stats. 1975, ch. 785, § 1, p. 1807) and made possession of a suction dredge near such waters unlawful (Stats. 1986, ch. 1368, § 23, pp. 4896–4897).

Responding to concerns that suction dredging disturbed endangered coho salmon habitats and contributed to mercury contamination of both fish and humans, in 2009 the Legislature imposed a temporary moratorium on the issuance of dredging permits pending further environmental review by the Department.

2

(Stats. 2009, ch. 62, § 1, adding Fish & G. Code, former § 5653.1; see Sen. Com. on Water, Parks & Wildlife, 3d reading analysis of Sen. Bill No. 670 (2009–2010 Reg. Sess.) as amended June 26, 2009, pp. 3–5.)  The moratorium went into immediate effect based on legislative findings that "suction or vacuum dredge mining results in various adverse environmental impacts to protected fish species, the water quality of this state, and the health of the people of this state."  (Stats. 2009, ch. 62, § 2.)  Two years later, in 2011, the Legislature placed a June 30, 2016, sunset on the moratorium in the event environmental review and new regulations were not complete by that date.  (Stats. 2011, ch. 133, § 6.)  The following year, the Department finished its environmental review but concluded it lacked regulatory authority to address fully the environmental impacts of suction dredging.  (See Stats. 2015, ch. 680, § 1, subd. (c).)  The Legislature removed the 2016 sunset (Stats. 2012, ch. 39, § 7) and in 2015 enacted legislation clarifying the scope of the Department's and other state agencies' regulatory authority (Stats. 2015, ch. 680, §§ 2, 4).  The moratorium on permits remains in place.

In 2012, defendant Brandon Rinehart was charged by criminal complaint with both possession and unpermitted use of a suction dredge.  (Fish & G. Code, § 5653, former subds. (a), (d), recodified as subds. (a), (e) by Stats. 2015, ch. 680, § 2.)  He demurred to the complaint.  Rinehart sought judicial notice of documents showing, and the People eventually stipulated, that he was operating on a mining claim he held on federal land in the Plumas National Forest.  Federal law "allow[s] United States citizens to go onto unappropriated, unreserved public land to prospect for and develop certain minerals.  'Discovery' of a mineral deposit, followed by the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes," i.e., a mining claim.  (*United States v. Locke* (1985) 471 U.S. 84, 86.)

Such a claim may apply to a lode or placer,[1] and may be patented or unpatented.[2] Rinehart holds an unpatented placer claim.

In his demurrer, Rinehart contended section 5653 and the related temporary moratorium statute, Fish and Game Code section 5653.1, effectively banned suction dredging in California, preventing Rinehart from using the only commercially practicable method of extracting gold from his mining claim. Because, according to Rinehart, Congress had granted prospectors the right to mine on federal land free from material interference (see 30 U.S.C. §§ 22, 612(b)), these provisions should be preempted as an obstacle to Congress's purposes and objectives.

After a hearing, the trial court overruled the demurrer. Having rejected as a matter of law the preemption defense, the court also excluded testimony Rinehart would have presented in support of that defense. Rinehart waived a jury. After a bench trial on stipulated facts, the court convicted Rinehart on both counts and sentenced him to three years' probation.

The Court of Appeal reversed. The court agreed with Rinehart that federal mining law should be interpreted as preempting any state law that unduly hampers mining on federal land. The court further concluded Rinehart had made a

---

[1]     A lode is a vein or body of minerals embedded in fixed rock. A placer is an area where minerals are found at or near the surface in loose earth, sand, or gravel, often by a riverside or in a riverbed. (See *United States v. Iron Silver Mining Co.* (1888) 128 U.S. 673, 679–680; *Gregory v. Pershbaker* (1887) 73 Cal. 109, 113–115.) The term lives on in names like Placer County and Placerville in the Gold Country of eastern California.

[2]     "An 'unpatented' claim is a possessory interest in a particular area solely for the purpose of mining; it may be contested by the government or a private party. By contrast, if a claim is patented, the claimant gets a fee simple interest from the United States and no contest can be brought against the claim." (*Clouser v. Espy* (9th Cir. 1994) 42 F.3d 1522, 1525, fn. 2.)

4

colorable argument that (1) the state regulatory scheme amounted to a de facto ban on suction dredging and (2) this ban rendered mining on his claim " 'commercially impracticable.' " (Quoting *California Coastal Comm'n v. Granite Rock Co.* (1987) 480 U.S. 572, 587 (*Granite Rock*).) Because the establishment of these points hinged on disputed factual issues and the trial court had refused to admit evidence pertaining to them, the court remanded for further proceedings.

DISCUSSION

I.      *Preemption of State Law on Federal Land*

The federal Constitution's property clause vests Congress with the power to "make all needful rules and regulations respecting the territory or other property belonging to the United States." (U.S. Const., art. IV, § 3, cl. 2.) Unlike the commerce clause, the property clause has no prohibitive effect when dormant. Instead, to displace the application of state law on federal land, Congress must act affirmatively. (*Kleppe v. New Mexico* (1976) 426 U.S. 529, 543 ["Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory. . . ."]; *Omaechevarria v. Idaho* (1918) 246 U.S. 343, 346 ["The police power of the State extends over the federal public domain, at least when there is no legislation by Congress on the subject."]; see *Granite Rock, supra,* 480 U.S. at pp. 580–581; *Butte City Water Co. v. Baker* (1905) 196 U.S. 119, 125–128 [rejecting the argument that the property clause by itself preempts states from regulating mining claims on federal land].) A state "is free to enforce its criminal and civil laws" on federal land, unless those laws conflict with federal legislation or regulation; in the event of a conflict, of course, "state laws must recede." (*Kleppe*, at p. 543.) In the absence of any such conflict, state and federal laws governing the same land routinely coexist. (See, e.g., *Granite Rock*, at pp. 576–577 [simultaneous state and federal mining permit requirements]; *United States v.*

5

*Locke*, *supra*, 471 U.S. at p. 89 [simultaneous state and federal mining claim filing requirements].) Dual sovereignty is the rule, federal exclusivity the exception.

Rinehart asserts two federal land statutes supply a defense to his criminal convictions. He contends the laws under which he was convicted are preempted by the general mining act of May 10, 1872 (30 U.S.C. § 22 et seq.; popularly known as the Mining Law of 1872) and by title 30 United States Code section 612, enacted as part of the Surface Resources and Multiple Use Act of 1955 (Pub.L. No. 84–167 (July 23, 1955) 69 Stat. 367). These statutes contain no express preemption provision, do not occupy a relevant field that would foreclose state regulation, and do not impose obligations that would make it impossible to comply simultaneously with state and federal law. Rinehart's preemption argument rests instead on obstacle preemption, the principle that a state may not adopt laws impairing "the accomplishment and execution of the full purposes and objectives of Congress." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67; accord, *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 312.) He bears the burden of demonstrating preemption. (*Quesada*, at p. 308.)

In ascertaining whether preemption applies, "[c]ongressional intent is the touchstone." (*Quesada v. Herb Thyme Farms, Inc.*, *supra*, 62 Cal.4th at p. 318; see *Wyeth v. Levine* (2009) 555 U.S. 555, 565.) Obstacle preemption can play an important role in preventing states from creating, inadvertently or otherwise, functional impediments that materially constrain legitimate federal objectives. But it can also lead to the overzealous displacement of state law to a degree never contemplated by Congress. Accordingly, the threshold for establishing obstacle preemption is demanding: "It requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress

6

that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was." (*Quesada*, at p. 312.)

The State of California's role in protecting the waters and the fish and wildlife within its borders is long-standing, predating even the federal laws upon which Rinehart relies. Under English common law, the sovereign held title to the navigable waters within a land's borders in trust for the benefit of the people. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434.) Under this public trust doctrine, California became trustee of the state's waters, with responsibility for their oversight, from the beginning of statehood. (*Ibid.*) So too regarding the fish in the state's streams and lakes: "The fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the state [citation], as in England it was in the king; and the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign, coming to us from the common law, and preserved and expressly provided for by the statutes of this and every other state of the Union." (*People v. Truckee Lumber Co.* (1897) 116 Cal. 397, 399–400; see Stats. 1852, ch. 62, p. 135 [regulating to protect the state's salmon]; *Geer v. Connecticut* (1896) 161 U.S. 519, 528 [tracing the ancient roots of the recognized "right of the States to control and regulate the common property in game"], overruled on other grounds by *Hughes v. Oklahoma* (1979) 441 U.S. 322, 326[3]; Cal. Const., art. I, § 25.)

---

[3]    *Hughes* retracted *Geer*'s 19th-century view that state regulation of fish and game was immune to commerce clause objections, but left otherwise undisturbed the several states' power "to protect and conserve wild animal life within their borders." (*Hughes v. Oklahoma*, *supra*, 441 U.S. at p. 338.)

Following the United States Supreme Court's lead, we traditionally have applied a strong presumption against preemption in areas where the state has a firmly established regulatory role. (*Quesada v. Herb Thyme Farms, Inc.*, *supra*, 62 Cal.4th at pp. 312–313; *City of Los Angeles v. County of Kern* (2014) 59 Cal.4th 618, 631.) Rinehart contends no presumption should arise here because state law is being used to regulate conduct on federal land, where congressional power is plenary. (See U.S. Const., art. IV, § 3, cl. 2.) The People disagree, urging that because the challenged state laws involve subjects traditionally within the state's regulatory purview, preemption is disfavored even on federal land. In the circumstances of this case, we need not resolve this dispute, because the conclusion we would reach with or without the presumption is unchanged: Rinehart has not carried his burden of establishing congressional purposes and objectives that require California's environmental regulations be displaced.

II.      *Preemption Under the Mining Law of 1872*

Rinehart's principal argument is that the present moratorium on suction dredging stands as an obstacle to the purposes of Congress implicit in the Mining Law of 1872. In *Granite Rock*, the leading decision on the mining law's preemptive effect, the Supreme Court rejected the argument that the law categorically forecloses states from imposing permit requirements on federal land. (*Granite Rock, supra*, 480 U.S. at pp. 582–584.) But *Granite Rock* involved a facial challenge to the requirement that a company obtain California Coastal Commission permits before engaging in mining. The Supreme Court's decision left open the possibility of future preemption challenges to specific permit requirements or, as here, refusals to issue a permit. (*Id.* at p. 594.) Rinehart presents such a challenge.

In *Granite Rock*, the party asserting preemption "concede[d] that the Mining Act of 1872, as originally passed, expressed no legislative intent on the as

8

yet rarely contemplated subject of environmental regulation." (*Granite Rock*, *supra*, 480 U.S. at p. 582.)  Rinehart makes no such concession, but we reach the same no preemption conclusion:  The purposes and objectives underlying the 1872 law do not require displacement of the challenged state laws.

> A.     Text

We begin with the relevant federal statutes.  The Mining Law of 1872 allows citizens to enter federal land freely and explore for valuable minerals.  (30 U.S.C. § 22; *Granite Rock*, *supra*, 480 U.S. at p. 575; *United States v. Locke*, *supra*, 471 U.S. at p. 86.)  Locators of valuable minerals may obtain a right to possess and develop the area around their claim, with title remaining with the United States.  (30 U.S.C. §§ 26, 35; *Granite Rock*, at p. 575; *Locke*, at p. 86.)  The law and its regulations spell out further steps a miner may take to acquire not only possession, but formal title—a patented claim.  (30 U.S.C. §§ 29, 37; 43 C.F.R. § 3861.1 et seq. (2016); *Granite Rock*, at pp. 575–576; *Locke*, at p. 86.)

While these provisions all generally involve mining, their focus is considerably more specific—the delineation of the real property interests of miners vis-à-vis each other and the federal government.  The provisions of the 1872 law identify in detail the conditions for obtaining, and extent of, a right of occupancy (30 U.S.C. §§ 26–27), the conditions for obtaining complete title (*id.*, §§ 29, 37), the size of claims (*id.*, §§ 23, 35), the marking and recordation of claims (*id.*, §§ 28, 34), how disputes between claimants are to be resolved (*id.*, § 30), and so on.  The discovery of a valuable claim is in every instance a condition for thereafter obtaining some possessory or fee simple interest in federal land (*id.*, § 22; *United States v. Coleman* (1968) 390 U.S. 599, 600–603), but the act as a whole is devoted entirely to the allocation of real property interests among those who would exploit the mineral wealth of the nation's lands, not regulation of the process of exploitation—the mining—itself.

9

As discussed, the property clause alone does not foreclose states from exercising their ordinary police powers on federal land; Congress must act. From time to time in the years prior to 1872, California had seen fit to regulate mining within its borders. (See, e.g., Stats. 1860, ch. 212, pp. 175–176 [conveyance of mining claims]; Stats. 1863–1864, ch. 91, p. 91 [disputes over property within mining claims]; Stats. 1865–1866, ch. 600, pp. 828–830 [mining partnerships].) The 1872 law is explicit concerning the effect of such past and future laws: it endorses their continuing vitality and prospectors' ongoing obligations to abide by them. Claimants are granted a right of possession "so long as they comply with the laws of the United States, and with State, territorial, and local regulations." (30 U.S.C. § 26.) One exception applies; compliance with laws that are "in conflict with the laws of the United States governing [claimants'] possessory title" (*ibid.*) is not required. This narrow exception further underscores the real property focus of the law: the one area where the law *does* intend to displace state law is with respect to laws governing title. In other areas, state and local law are granted free reign.

More generally, the law endorses in the first instance local, rather than federal, control over the mining fields. (See 30 U.S.C. §§ 22 [mineral exploration on federal land shall occur subject to "the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States"], 28 [permitting miners to adopt local rules governing the possession of mining claims], 43 [approving state regulation of mining claim sales].) These express acknowledgements of the application of state and local law to federal mining claims suggest an apparent willingness on the part of Congress to let federal and state regulation broadly coexist, especially insofar as those state laws relate to matters other than a miner's "possessory title." (*Id.*, § 26.)

The text and history of title 30 United States Code section 21a, enacted a century later and codified as a preface to the Mining Law of 1872, also convey that Congress did not, and does not, intend mining to be pursued at all costs. The provision describes as the "continuing policy of the Federal Government" the promotion of (1) a private, "economically sound and stable domestic mining . . . industr[y], (2) the orderly and economic development of domestic mineral resources . . . to help assure satisfaction of industrial, security and environmental needs, (3) mining . . . research, including the use and recycling of scrap . . . , and (4) the study and development of methods . . . to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities." (30 U.S.C. § 21a.) These policies recognize the importance of stable, sustainable industrial-scale mining in order to avoid foreign dependence. (H.R.Rep. No. 91–1442, 2d Sess., pp. 2-4 (1970), reprinted in 1970 U.S. Code Cong. & Admin. News, pp. 5792–5794.) But they also acknowledge mining must be done in an "orderly" fashion and account for "environmental needs" and "any adverse impact" on "the physical environment." (30 U.S.C. § 21a; see H.R.Rep. No. 91–1442, at p. 5795 ["The reclamation of mined land, the recycling of scrap and waste materials and the development of methods to lessen any adverse impact on the environment must all receive consideration."].) Federal support for mining is not limitless.

Rinehart, however, asserts the 1872 law reflects a more expansive congressional purpose, an affirmative intent to grant individuals a federal right to mine, and requires preemption of state laws whenever they unduly infringe that right. He focuses on the opening passage of section 22, which provides: "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase

11

. . . ." (30 U.S.C. § 22.) To better understand the purposes and objectives underlying this and other provisions in the 1872 law, we may consider as well the history preceding and context surrounding their adoption. What the text implies, history confirms: no general federal right to mine, superior to the exercise of state police powers, was intended.

### B. Legislative History

Gold was discovered in California in 1848. Across the West, other discoveries of valuable minerals followed soon after. (*U. S. v. Shumway* (9th Cir. 1999) 199 F.3d 1093, 1098.) Congress debated how best to regulate mining of these resources but took no immediate action. (See Remarks of Sen. Stewart, Cong. Globe, 39th Cong., 1st Sess. (1866) p. 3226 [discussing earlier inaction]; Remarks of Rep. Ashley, Cong. Globe, 39th Cong., 1st Sess. (1866) p. 4053 [same].) For years, the prospectors who entered federal land to seek their fortunes operated without federal regulation (*Shumway*, at p. 1098; *Woodruff v. North Bloomfield Gravel Min. Co.* (C.C.D.Cal. 1884) 18 Fed. 753, 773), subject instead to state and territorial law and local custom (*Sparrow v. Strong* (1865) 70 U.S. 97, 104).

As the Civil War concluded, Congress returned attention to the mining of the West and the need for formal rules. Competing proposals contemplated two very different regimes. Led by Congressman George Julian of Indiana, eastern legislators pushed a measure that would have put mining land up for public auction, selling out from under miners the territory they had explored and developed.[4] In response, Senator William Stewart of Nevada proposed a system

---

[4] House of Representatives No. 322, 39th Congress, 1st Session, section 1, as introduced February 21, 1866; see Remarks of Representative Julian, Congressional Globe, 38th Congress, 2d Session (1865) pages 684–687; Remarks

*(footnote continued on next page)*

advocated by western legislators under which miners would be granted a right to occupy and, for a small fee, acquire title to the land they mined.[5]  The Stewart approach prevailed.  (See Act of July 26, 1866, ch. 262, 14 Stat. 251.)

The 1866 mining law provided a template for what followed.  Originally applicable only to lodes, the law's principles were extended to placer claims in 1870.  (Act of July 9, 1870, ch. 235, § 12, 16 Stat. 217; see *Deffeback v. Hawke* (1885) 115 U.S. 392, 401.)  Those principles, and much of the 1866 act's original language, were then incorporated into the Mining Law of 1872.  (Act of May 10, 1872, ch. 152, 17 Stat. 91, codified at 30 U.S.C. § 22 et seq.)[6]  The provision at the heart of Rinehart's preemption claim, title 30 United States Code section 22, was drawn with minor rewording from the 1866 act.  (Compare 30 U.S.C. § 22 with Act of July 26, 1866, ch. 262, § 1, 14 Stat. 251.)

These laws undoubtedly had as their central mission the orderly development of the nation's valuable mineral resources.  (See *United States v. Coleman*, *supra*, 390 U.S. at p. 602.)  But the way in which Congress went about

---

*(footnote continued from previous page)*

of Representative Julian, Congressional Globe, 39th Congress, 1st Session (1866) pages 4050–4051.

[5]  House of Representatives No. 365, 39th Congress, 1st Session, as amended in the Senate July 19, 1866; see Remarks of Representative Ashley, Congressional Globe, 39th Congress, 1st Session (1866) page 4021; *High Country Citizens Alliance v. Clarke* (10th Cir. 2006) 454 F.3d 1177, 1183–1184.

[6]  See, e.g., Remarks of Representative Sargent, Congressional Globe, 42d Congress, 2d Session (1872) page 534 (the 1872 law involved no "change in the slightest degree [of] the policy of the Government in the disposition of the mining lands"); *High Country Citizens Alliance v. Clarke*, *supra*, 454 F.3d at page 1183 (the 1872 law "essentially served to combine and fine tune" the 1866 and 1870 acts).

13

establishing incentives to invest time and capital in a potentially risky enterprise is instructive.  First, the main inducement offered was the preservation, and endorsement going forward, of an existing system for the allocation of real property rights.  The 1866 act was drafted as protection for miners against the threatened exercise by Congress of its latent property clause power to sell land.  (See, e.g., Remarks of Sen. Stewart, Cong. Globe, 39th Cong., 1st Sess. (1866) pp. 3225–3229; Remarks of Rep. Higby, Cong. Globe, 39th Cong., 1st Sess. (1866) p. 4054.)  The "general purpose of the act . . . was to give the sanction of the government to possessory rights acquired under the local customs, laws, and decisions of the courts." (*Jennison v. Kirk* (1879) 98 U.S. 453, 461.)  By legislating, Congress endorsed the status quo and "prevent[ed] such rights from being lost on a sale of the lands." (*Id.* at p. 457; see *High Country Citizens Alliance v. Clarke*, *supra*, 454 F.3d at p. 1184.)  The mining laws gave prospectors tools to secure their real property interests against federal action.

Second, while occupation and development of one's claim might protect against a federal sale, it did not insulate against parochial regulation.  The 1866 act, unlike Representative Julian's proposal, gave the force of law to local miner rules.  (Compare Act of July 26, 1866, ch. 262, §§ 1–2, 14 Stat. 251–252 with H.R. No. 322, 39th Cong., 1st Sess. (1866).)  It also authorized state and territorial legislatures to regulate land sales to miners.  (Act of July 26, 1866, ch. 262, § 5, 14 Stat. 252.)  These features were carried forward to the Mining Law of 1872.  (Act of May 10, 1872, ch. 152, §§ 1, 9, 17 Stat. 91, 94, codified at 30 U.S.C. §§ 22, 43.)  Additionally, the Mining Law of 1872 conditioned miners' rights of possession on ongoing compliance with existing and future state regulations.  (Act of May 10, 1872, ch. 152, § 3, 17 Stat. 91, codified at 30 U.S.C. § 26.)

From this history, we may infer Congress was concerned principally with removing federal obstacles to mining, and specifically the threat of a property sale,

that might deter individual prospectors and mining concerns from investing effort in mineral development. Granted a right to enter federal land, the opportunity to obtain a right of possession, and the opportunity to acquire ownership, miners could pursue mineral discovery and exploitation free from the specter of having the land they worked sold at auction. In contrast, the purpose Rinehart attributes to these laws—an intent to confer a right to mine, immune in whole or in part from curtailment by regulation—is not apparent. The mining laws were neither a guarantee that mining would prove feasible nor a grant of immunity against local regulation, but simply an assurance that the ultimate original landowner, the United States, would not interfere by asserting its own property rights.

Rinehart correctly notes the 1872 law conferred on him and others specific property rights. Rinehart has an interest in land, a real property right to possess the area of his claim for particular purposes. (See *Wilbur v. United States ex rel. Krushnic* (1930) 280 U.S. 306, 316–317; *Cole v. Ralph* (1920) 252 U.S. 286, 295.) But the grant of a real property interest does not ordinarily carry with it immunity from regulation, a guarantee that the state police power will be inoperative simply because the source of the real property interest is federal. Given this, if Congress intended to do more, we can reasonably infer it would have said so. It did not; indeed, quite to the contrary, it specifically noted the continuing obligation of miners with possessory interests, such as Rinehart, to obey state law. (See 30 U.S.C. §§ 26, 35.) Collectively, the text and legislative history reveal no intent to displace state law.

### C. Congressional Acquiescence in State Regulation of Mining Methods

Our confidence in this reading of the 1872 law is enhanced by Congress's reaction to state law limitations on mining in the immediate wake of the law's passage. When in 1884 the application of California law resulted in a de facto ban

15

on a major industrial mining method, Congress did not move to restore the affected mining companies' rights. Instead, it expressly approved and helped enforce the ban, which stayed in place for nearly a decade.

By the early 1850s, much of the low-hanging fruit, the densest deposits of loose gold flakes and nuggets, had been picked clean from the Sierra Nevada foothills. Prospectors turned from panning and digging to other more efficient techniques. (Kelley, Gold vs. Grain: The Hydraulic Mining Controversy in California's Sacramento Valley (1959) pp. 23–28 (Kelley, Gold vs. Grain); Leshy, The Mining Law (1987) p. 184.) Chief among these, hydraulic mining involved blasting hillsides with large volumes of high-pressure water to liquefy the earth and cull from it gold. (See Pub. Resources Code, § 3982; *Woodruff v. North Bloomfield Gravel Min. Co.*, *supra*, 18 Fed. at p. 756; Kelley, at pp. 27–56 [discussing the rise of industrial-scale hydraulic mining].) While effective, this method also had substantial environmental impacts. Its waste products—gravel, silt, and other earthen debris—washed downstream, filled up riverbeds, and triggered devastating floods in lowland farming communities.[7] (*Woodruff*, at pp. 756–763, 766–768; Kelley, at pp. 56–67; Leshy, at pp. 184–185.) To cope with this " 'moving avalanche' " (Kelley, at p. 244), Central California towns and the state spent vast sums on dams and levees, with mixed success (*id.* at pp. 58, 65, 119, 198; *Woodruff*, at pp. 763–767).

---

[7] During the heyday of hydraulic mining, more than triple the volume of earth excavated in digging the Panama Canal was discharged into the Yuba River, just one of four affected waterways. (Bezerra & West, *Submerged in the Yuba River: The State Water Resources Control Board's Prioritization of the Governor's Commissions Proposals* (2005) 36 McGeorge L.Rev. 331, 332.) During one typically overwhelming 1875 flood, the City of Marysville was turned into "a vast dump for mining debris" after its levees broke. (Kelley, Gold vs. Grain, *supra*, at pp. 66–67.)

In time, state officials and members of Central Valley communities sued hydraulic mining companies under state nuisance law and obtained permanent injunctions prohibiting the discharge of debris into various waterways (see, e.g., *People v. Gold Run D. & M. Co.* (1884) 66 Cal. 138, 152; *Woodruff v. North Bloomfield Gravel Min. Co.*, *supra*, 18 Fed. at pp. 806–809), which had the practical effect of banning the mining practice. Of note, the *Woodruff* court considered at length and rejected the mining industry's argument for preemption under the Mining Law of 1872. The *Woodruff* defendants argued federal legislation "recognize[ed] mining as a proper and lawful employment, and encourage[ed] this industry" with full knowledge of the environmental consequences it might impose, and thus they could not be enjoined. (*Woodruff*, at p. 770.) The court identified as the purpose of the mining laws the granting to miners of estates in land and the legalization of what had been trespasses (*id.* at pp. 773–774), and found no purpose to authorize mining notwithstanding any proscriptions in state law addressed to its collateral consequences.

Though the injunctions effectively crippled a major industry (*North Bloomfield Gravel Min. Co. v. U. S.* (9th Cir. 1898) 88 Fed. 664, 671; Kelley, Gold vs. Grain, *supra*, at pp. 243–270) and de facto forbade a predominant form of mining, even on federal land, Congress endorsed the state law ban. In 1886, Congress appropriated money for improvement of the Sacramento and Feather Rivers, but conditioned its expenditure on the Secretary of War satisfying himself "that hydraulic mining hurtful to navigation has ceased on said rivers and their tributaries." (Act of Aug. 5, 1886, ch. 929, 24 Stat. 310, 326 (1886).) If the Secretary of War found hydraulic mining had not ceased, he was "instructed to institute such legal proceedings as may be necessary" to end it. (*Ibid.*)

Seeking an accommodation between mining and farming interests, our Legislature warned Congress that "the mining industry of our State is in imminent

17

danger of being entirely suppressed" and asked for action. (Assem. J. Res. No. 10, Stat. 1887 (1887 Reg. Sess.) res. ch. 10, p. 253.) Senator Stewart, the author of the original 1866 mining act and the chair of the Committee on Mines and Mining, submitted a report to Congress advising that state law injunctions had "practically stopped" hydraulic mining and "rendered valueless" the affected miners' property (Sen.Rep. No. 1944, 50th Cong., 1st Sess., p. 2 (1888)) and favoring inquiry into whether there was any way to resume hydraulic mining without further damaging California's rivers (*id.* at pp. 1, 4). Acting on the committee's recommendation, Congress allocated money for an "investigation of the mining debris question in the State of California," directing a commission of engineers to determine whether "the present conflict between the mining and farming sections may be adjusted and the mining industry rehabilitated." (Act of Oct. 1, 1888, ch. 1057, 25 Stat. 498, 498 (1888).) The commission's recommendations eventually led to the 1893 reauthorization of hydraulic mining, albeit on terms replicating the restraints state law had placed on the mining companies' perceived right to mine. (Act of Mar. 1, 1893, ch. 183, 27 Stat. 507 (1893), codified as amended at 33 U.S.C. § 661 et seq.) Hydraulic mining now required a permit from the newly formed California Debris Commission, a permit that could be obtained only upon assurances that mining would not harm the state's rivers and lowland communities. (33 U.S.C. §§ 663, 670–678; see *North Bloomfield Gravel Min. Co. v. U. S.*, *supra*, 88 Fed. at p. 674 [upholding the requirement].) This conditional approval did not revive the practice; hydraulic mining under an obligation to impound one's own debris proved economically infeasible, and the industry never recovered. (Kelley, Gold vs. Grain, *supra*, at pp. 291–292.)

From this chapter in history, we may infer that Congress in the late 19th century, at a time not long removed from passage of the Mining Law of 1872 and related enactments, did not view these laws as conveying a federal right to mine

18

on federal land without regard to any environmental impacts a particular method might have and any interests a state might seek to protect. *Woodruff* and related cases did not merely impose damages, reallocating the burden of the impacts of mining to those responsible, but issued injunctions. For nearly a decade, hydraulic mining, a method of far greater economic significance than the suction dredging at issue here, stood in abeyance based solely on state laws giving priority to other concerns. Congress, including even the author of the law first declaring federal land open to mining, was explicitly aware of this circumstance. Yet it acquiesced in hydraulic mining's discontinuation, allocating money to prosecute miners (see Sen.Rep. No. 1944, 50th Cong., 1st Sess., p. 2 (1888); Act of Aug. 5, 1886, ch. 929, 24 Stat. 310, 326 (1886)) instead of taking action to assert federal supremacy, protect any supposed federal right to mine, and ensure the continued availability of federal lands for hydraulic mining notwithstanding contrary state law. It stands to reason that Congress did not deem the core purposes and objectives of the mining laws impaired by state regulation of mining methods and further, that states can place limits on effective but environmentally destructive mining methods without contravening the supremacy clause.

Rinehart distinguishes the *Woodruff* injunction on the ground it involved impacts felt elsewhere than on federal land, but this is a distinction without a difference.[8] The effect of the injunction was to prohibit a major, widespread mining technique everywhere, including on federal land. To the extent the Mining Law of 1872 might have been construed as creating a federal right to mine on

---

[8] Indeed, it is not even a distinction. The impacts the Legislature perceived as warranting a temporary moratorium here—on fish, water quality, and the health of the state's inhabitants—are likewise experienced elsewhere than just the federal land on which Rinehart seeks to mine.

19

federal land, that right would have been equally burdened by a mining technique ban premised on impacts elsewhere as by one premised on impacts on federal land itself. The argument that the suction dredging moratorium challenged here poses a greater or different obstacle to posited federal rights than the nine-year hydraulic mining ban does not withstand scrutiny.

Rinehart also relies on title 30 United States Code section 51, which authorizes damages actions for harm arising from the digging of ditches or canals, as a way to differentiate the *Woodruff* injunction from the present moratorium. However, if the purposes and objectives of the mining laws were as Rinehart posits, state law authorizing an injunction would still have been preempted, notwithstanding section 51, with the only proper remedy lying in a federal action for damages. In the eyes of the *Woodruff* court, however, and manifestly in the eyes of Congress at the time, such a state-law-based injunction did not contravene federal rights.

In sum: Like the hydraulic mining industry, Rinehart argues he holds a superior federal right to mine that allows him to proceed, notwithstanding impacts on other interests. Like the court in *Woodruff* and Congress thereafter, we conclude that is not so. The federal statutory scheme does not prevent states from restricting the use of particular mining techniques based on their assessment of the collateral consequences for other resources.[9]

---

**9**     Rinehart takes issue with the Legislature's assessment of those collateral consequences, dismissing the impacts of suction dredging as minimal. In this proceeding, we are without authority to countermand the Legislature's judgment. The only issue for us is whether federal law permits the Legislature to favor other interests it deems in need of protection at the expense of mining.

D.  Case Law

Against the lessons of text and history, Rinehart argues that we should follow a series of cases from other courts finding various state restrictions on mineral exploitation preempted on one basis or another.  (See *South Dakota Mining Ass'n, Inc. v. Lawrence County* (8th Cir. 1998) 155 F.3d 1005, 1009–1011; *Skaw v. U. S.* (Fed. Cir. 1984) 740 F.2d 932, 940; *Ventura County v. Gulf Oil Corp.* (9th Cir. 1979) 601 F.2d 1080, 1083; *Brubaker v. Bd. of Cty. Com'rs, El Paso Cty.* (Col. 1982) 652 P.2d 1050, 1059; *Elliott v. Oregon Intern. Mining Co.* (Or.Ct.App. 1982) 654 P.2d 663, 668; but see *Bohmker v. Oregon* (D.Or. Mar. 25, 2016 No. 1:15-cv-01975-CL) ___ F.Supp.3d ___ [2016 U.S. Dist. Lexis 39163] [no preemption of state moratorium on motorized instream mining]; *Beatty v. Washington Fish & Wildlife Com'n* (Wn.Ct.App. 2014) 341 P.3d 291, 307–308 [no preemption of state restrictions on suction dredging].)  We do not find these cases persuasive.

First, all but one predates the United States Supreme Court's landmark 1987 decision in *Granite Rock*, *supra*, 480 U.S. 572, which for the first time clearly established the states' authority to regulate on environmental grounds mining claims within their borders.  Second, two of the cases involve statutes other than the one at issue here.  *Ventura County*, an oil drilling case, found preemption based on a conflict with the Mineral Lands Leasing Act of 1920.  (30 U.S.C. §§ 181–263; see *Ventura County v. Gulf Oil Corp.*, *supra*, 601 F.2d at pp. 1083–1084.)  In *Elliott*, the challenged mining took place on land governed by the Stock Raising Homestead Act of 1916 and subject to a patent that expressly reserved to the defendants " 'the right to prospect for, mine, and remove' " minerals under the provisions of that act.  (*Elliott v. Oregon Intern. Mining Co.*, *supra*, 654 P.2d at p. 665 quoting 43 U.S.C. § 291 (1970) repealed by Pub.L. No. 94–579, § 702, 90 Stat. 2787 (1976).)  Third, the remaining cases uniformly omit

21

any close examination of the text, legislative history, and historical context of the 1872 law. To the extent they rely on a cursory understanding of congressional purposes, they are not convincing.

Rinehart relies most heavily on his only post-*Granite Rock* case, *South Dakota Mining Ass'n, Inc. v. Lawrence County*, *supra*, 155 F.3d 1005, which the Court of Appeal concluded was "nearly directly on point here." *Lawrence County* considered an ordinance banning surface mining in an area overlapping a national forest.[10] *Lawrence County* concluded the ban was inconsistent with the 1872 law's purposes, which it held included "the encouragement of exploration for and mining of valuable minerals located on federal lands, providing federal regulation of mining to protect the physical environment while allowing the efficient and economical extraction and use of minerals, and allowing state and local regulation of mining so long as such regulation is consistent with federal mining law." (*Lawrence County,* at p. 1010.)

We do not disagree that Congress adopted a real property regime in the Mining Law of 1872 with the larger purpose in mind of encouraging ongoing mineral exploration across the West. Where we part company is with the conclusion that such general, overarching goals would be frustrated by state and local determinations that the use of particular methods, in particular areas of the country, would disserve other compelling interests. Congress could have made express that it viewed mining as the highest and best use of federal land wherever minerals were found, or could have delegated to federal agencies exclusive authority to issue permits and make accommodations between mining and other purposes. It did neither, instead committing miners to continued compliance with

---

[10] Surface mining involves stripping off the top of an area to reach minerals, in contrast to boring down through tunnels or shafts to extract them.

22

state and local laws (30 U.S.C. § 26) and endorsing limits on destructive mining techniques imposed under such laws (Act of Mar. 1, 1893, ch. 183, 27 Stat. 507 (1893)).  These actions cannot be reconciled with the view that Congress intended preemption of such state and local determinations.

III.     *Preemption Under Section 612*

Additionally, Rinehart urges the moratorium is preempted by title 30 United States Code section 612(b).  We conclude no basis for preemption has been shown.

Section 612 of title 30 United States Code was enacted in 1955 as part of a " 'crack-down' upon unauthorized uses of unpatented mining claims." (*Funderberg v. Udall* (9th Cir. 1968) 396 F.2d 638, 639.)  Concerned that some mining claims were being staked out as a pretext to support activities wholly unrelated to mineral development, Congress prospectively prohibited the use of unpatented mining claims for anything not "reasonably incident" to prospecting and mining.  (30 U.S.C. § 612(a); see *U. S. v. Shumway*, *supra*, 199 F.3d at p. 1101; *Funderberg*, at p. 639; H.R.Rep. No. 730, 84th Cong., 1st Sess. (1955), pp. 5–7, reprinted in 1955 U.S. Code Cong. & Admin. News, No. 2, pp. 2478–2480.)

Congress also focused on the need to better accommodate competing surface and subsurface uses of federal land.  (H.R.Rep. No. 730, 84th Cong., 1st Sess. (1955), pp. 3, 8, reprinted in 1955 U.S. Code Cong. & Admin. News, No. 2, pp. 2475, 2480.)[11]  Mining claimants had traditionally been granted exclusive use

_____

[11]     Contrary to Rinehart's view that Congress has deemed mining the absolute highest and best use of mining land, the congressional committee considering amendments to federal law that led to enactment of section 612 (30 U.S.C.) noted the "principal problem faced by the Congress" in the years since the 1872 law's adoption had been how to "encourage mining activity" in a way "compatible with

*(footnote continued on next page)*

of the land encompassed by their claims.  (30 U.S.C. § 26; H.R.Rep. No. 730, at pp. 2477–2478; *U. S. v. Curtis-Nevada Mines, Inc.* (9th Cir. 1980) 611 F.2d 1277, 1281.)  Congress withdrew that exclusivity in favor of a right retained by the federal government and its permittees and licensees to use, manage, and dispose of the surface resources of the claim.  (30 U.S.C. § 612(b);[12] see H.R.Rep. No. 730, at pp. 2482–2483; *Curtis-Nevada Mines*, at pp. 1281–1283.)  In turn, this retained right was subject to the condition that the United States and other users not "endanger or materially interfere with" mining operations.  (30 U.S.C. § 612(b); see *Curtis-Nevada Mines*, at pp. 1283–1286.)

Nothing in California's regulation of suction dredging implicates or interferes with any of the purposes and objectives underlying this congressional reallocation of rights.  Congress concerned itself with abuses of the existing claim system by miners and the need to accommodate competing demands on federal land, and sought to end sham claims and ensure to others enjoyment of federal lands to the extent compatible with mining.  Section 612 of title 30 United States Code regulates the respective property rights of miners with claims on federal

---

*(footnote continued from previous page)*

utilization, management, and conservation of surface resources such as water [and] fish."  (H.R.Rep. No. 730, 84th Cong., 1st Sess. (1955), p. 3, reprinted in 1955 U.S. Code Cong. & Admin. News, No. 2, p. 2475.)

[12]     That subdivision provides in relevant part:  "Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes [i.e., management etc. of surface resources] or for access to adjacent land: *Provided, however*, That any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto . . . ."  (30 U.S.C. § 612(b).)

land, on the one hand, and the United States and its permittees who may wish to use that same land for other purposes, on the other.  It does no more.

Rinehart infers from the text of title 30 United States Code section 612(b) a general command that state regulation to protect environmental interests may not "materially interfere" with mining.  The text is not susceptible to such a reading.  By its terms, the "materially interfere" standard defines what the United States and its licensees and permittees may not do on the surface of mining claims, not what states in the exercise of their police powers may not do.

Rinehart also contends that because the last portion of section 612(b) assures certain states their laws concerning water rights will not be affected, Congress by implication preempted state law in all other regards.  The final clause of section 612(b) states: "*Provided further*, That nothing in this subchapter and sections 601 and 603 of this title shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian[13] relating to the ownership, control, appropriation, use, and distribution of ground or surface waters within any unpatented mining claim."  This language was added to "make[] clear an intent to leave unaffected the operation of State water laws in the reclamation West governing the ownership, control, appropriation, use, and distribution of ground or surface waters."  (H.Conf. Rep. No. 1096 on H.R. 5891, 84th Cong., 1st Sess. (1955), reprinted in 1955 U.S. Code Cong. & Admin. News, p. 2497.)  That Congress wanted to reassure western states that existing critical arrangements concerning their respective water rights would not be disturbed does

---

**13**      The 98th meridian cuts through the Great Plains states, from North Dakota through Texas.

not thereby establish an intent, not otherwise evident from the text or legislative history, to alter or displace state law in other respects.

Nor do the cases Rinehart relies on support preemption under section 612(b). *U. S. v. Shumway*, *supra*, 199 F.3d 1093, 1105–1108 addresses the interplay between the mining laws and the Act of Congress authorizing oversight of the national forests by the National Forest Service. (See 16 U.S.C. §§ 478, 551.) *Shumway* concludes, consistent with precedent, that the Forest Service's authority extends to regulating mining claims insofar as such "regulations are 'reasonable' and do not impermissibly encroach on legitimate uses incident to mining and mill site claims." (*Shumway*, at p. 1107; see *U. S. v. Weiss* (9th Cir. 1981) 642 F.2d 296, 298–299 [concluding the forest service may impose reasonable environmental regulations on mining operations in national forests].) *Shumway* does not interpret section 612(b), or any other federal statute, as preempting state environmental regulations.

*U. S. v. Backlund* (9th Cir. 2012) 689 F.3d 986 likewise does not interpret the objectives of section 612(b) in a way that would require preemption of state environmental regulation. Rejecting a void for vagueness challenge to Forest Service limits on unpermitted permanent residences in national forests, the Ninth Circuit explains that the Forest Service's regulatory authority is limited by, inter alia, the requirement that regulations not " 'materially interfere' " with mining. (*Backlund*, at p. 997, quoting 30 U.S.C. § 612(b).) *Backlund* reads section 612 as we do, as striking an accommodation between federal solicitousness for mining on federal land and federal management of the surface of mining claims. It does not impute to Congress any broader purpose that would support state law preemption.

26

DISPOSITION

For the foregoing reasons, we reverse the Court of Appeal.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rinehart

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 230 Cal.App.4th 419
**Rehearing Granted**

_____

**Opinion No.** S222620
**Date Filed:** August 22, 2016

_____

**Court:** Superior
**County:** Plumas
**Judge:** Ira R. Kaufman

_____

**Counsel:**

Murphy & Buchal and James L. Buchal for Defendant and Appellant.

Damien M. Schiff, James S. Burling and Jonathan Wood for Pacific Legal Foundation, Western Mining Alliance and Siskiyou County as Amici Curiae on behalf of Defendant and Appellant.

Parsons Behle & Latimer, Brook B. Bond, L. Michael Bogert; Mountain States Legal Foundation, Steven J. Lechner and Jeffrey W. McCoy for American Exploration & Mining Association as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Edward C. DuMont, State Solicitor General, Mark J. Breckler, Chief Assistant Attorney General, Robert W. Byrne, Assistant Attorney General, Joshua A. Klein, Deputy State Solicitor General, Gavin G. McCabe, Michael M. Edson, Marc N. Melnick and J. Kyle Mast, Deputy Attorneys General, for Plaintiff and Respondent.

Jonathan Evans; Saxton & Associates and Lynne R. Saxton for Karuk Tribe, Center for Biological Diversity, Friends of the River, Klamath Riverkeeper, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Environmental Law Foundation, California Sportfishing Protection Alliance, Foothill Angler's Coalition, North Fork American River Alliance, Upper American River Foundation and Central Sierra Environmental Resource Center as Amici Curiae on behalf of Plaintiff and Respondent.

Sean B. Hecht and Eric Biber for John D. Leshy and Alejandro E. Camacho as Amici Curiae on behalf of Plaintiff and Respondent.

John C. Cruden, Assistant Attorney General, and Lane N. McFadden for The United States as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James L. Buchal
Murphy & Buchal
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
(503) 227-1011

Marc N. Melnick
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA  94612-0550
(510) 622-2133